IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RNA CORPORATION,　　　　　　　　　)
an Illinois corporation,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　Plaintiff,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　v.　　　　　　　　　　　　　　　) No. 01C 6321
　　　　　　　　　　　　　　　　　　) JUDGE MORAN
MINNETONKA BRANDS, INC,　　　　　　)
a Minnesota corporation,　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　Defendant,　　　　　　　　　　)

## DEFENDANT'S ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM

Now comes the Defendant, Minnetonka Brands, Inc., by its attorney, Thomas Flannigan, and hereby answers the complaint of the Plaintiff, RNA Corporation as follows:

### Count I – Breach of Contract

1.　　Plaintiff, RNA Corporation ("RNA"), is an Illinois corporation with its principal place of business located at 13750 South Chatham Street, Blue Island, Cook County, Illinois. RNA is a contract filler and assembler of personal care products, including hair care and bath products.

**ANSWER:** Admit

2.　　Defendant, Minnetonka Brands, Inc. ("MBI"), is a Minnesota corporation with its principal place of business located at 7665 Commerce Way, Eden Prairie, Minnesota. MBI is in the business of marketing, on a wholesale basis, proprietary brands of personal care products, including hair care and bath products.

**ANSWER:** Admit

3. The jurisdiction of this Court is invoked pursuant to 28 U.S.C § 1332, in that the amount in controversy exceeds $75,000, exclusive of costs and interest, and there is diversity of citizenship between the parties. In addition, the parties have stipulated to this Court's jurisdiction. (See "Contract Filling Purchase Agreement" dated March 1, 1999, ¶ 11, attached as Exhibit A.)

**ANSWER:** Admit

4. Venue for this action is proper in this district pursuant to 28 U.S.C. § 1391(a)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

**ANSWER:** Admit

5. In March 1999, RNA and MBI entered into a minimum three year "Contract Filling Purchase Agreement" dated March 1, 1999 (the "Agreement"). A true and correct copy of the Agreement is attached as Exhibit A. Under the terms of the Agreement, RNA committed to assembling and furnishing MBI with a minimum of 600,000 units if various personal care products on a monthly basis, and quoted prices for such products based on the stated quantities. In exchange, MBI agreed to purchase such minimum quantities and to pay RNA in accordance with the terms set forth therein.

**ANSWER:** MBI admits that RNA and MBI executed said Agreement, which is attached to RNA's complaint and speaks for itself. MBI denies that the Agreement required MBI to purchase 600,000 units per month, further stating that paragraph 4 of the Agreement provides: "Unit commitment by MBI is subject to customer demand."

6. To furnish MBI with the products requested in sufficient quantities and to comply with its other obligations under the Agreement, RHA purchased additional equipment, including a 16-head rotary filler and copper machine, two labeler units, two 4,000-gallon tanks, and a video jet coder, and secured approximately 16,000 additional

2

feet of warehouse space for storage of MBI components, all at substantial cost. In addition, RNA purchased significant quantities of specially blended chemicals specific to the MBI production, and remains in possession of certain of these chemicals at a cost of $45,636.41. The cost of this equipment, materials, space rental and chemicals exceeded $100,000.

**ANSWER:** MBI lacks sufficient information to admit or deny the allegations of paragraph 6 and demands strict proof thereof.

7. In September 1999, after MBI had accepted significant quantities of specially designed hair care and bath products from RNA, and MBI had incurred a sizable, unpaid balance with RNA, MBI began a financial reorganization. In recognition of the financial constraints facing MBI, RNA agreed to defer enforcement of the payment term of "Net 60 days from shipment or storage at RNA" for future orders. In consideration thereof, MBI committed to making weekly payments to RNA of $10,000, less the value of goods ordered and shipped for the period September 17, 1999 to October 8, 1999, and weekly payments of $20,000, less the value of goods ordered and shipped thereafter, until the remaining MBI balance was paid in full.

**ANSWER:** MBI admits that in or about September, 1999, RNA and MBI had negotiations concerning shipment of goods and payment terms, as well as negotiations concerning poor quality and shipment delays involving goods from shipped from RNA to MBI.

8. During the third quarter of 2000, MBI informed RNA that it would not be able to meet the $20,000 weekly minimum payment, due to a decline in business. At MBI's request, RNA extended a grace period based upon MBI's commitment to submit and adhere to a payment schedule for the fourth quarter.

3

**ANSWER:** MBI admits that in late 2000, RNA and MBI had negotiations concerning shipment of goods and payment terms, as well as negotiations concerning poor quality and shipment delays involving goods shipped from RNA to MBI.

9. On October 5, 2000, MBI submitted a pay schedule for the 12-week period of October 13 through December 29, 2000. MBI's Schedule, a copy of which is attached as Exhibit B, committed MBI to a "Best Case" and "Worst Case" scenario for payment during the 5-week period of October 13 through November 10, 2000, and only a "Best Case" scenario of $20,000 per week for the 7-week period of November 17 to December 29, 2000.

**ANSWER:** MBI admits that it prepared a document which is attached to RNA's complaint as exhibit B and speaks for itself, further stating that said document relates to payment for goods and does not reflect negotiations between MBI and RNA concerning poor quality and shipment delays involving goods shipped from RNA to MBI.

10. While MBI's payment for the 5-week period ending with the week of November 10, 2000 did fall within the broad range it established, not one payment made during the period ending December 29, 2000 even approached the $20,000 level MBI set for itself. Rather than pay the committed-to sum of $140,000 for this period, MBI paid, in the aggregate, only $70,800.81. Continuing thereafter, MBI has made only partial payments on RNA invoices and even these were made months after the invoices were due, and in insubstantial amounts.

**ANSWER:** MBI lacks sufficient knowledge to determine what RNA considers "insubstantial".

4

11. As contemplated by ¶ 7 of the Agreement, on January 19, 2001, RNA sent MBI a Notice to Cure its breaches of the Agreement within 30 days. A copy of the 1/19/01 letter is attached as Exhibit C. MBI did not so cure.

**ANSWER:** MBI admits that on or about January 19, 2001, RNA sent a letter to MBI, which is attached to the Complaint and speaks for itself.

12. On January 25, 2001, MBI responded by asking RNA to reestablish manufacturing activities, offered to make weekly installment payments in an effort to reduce the outstanding accounts receivable, and pledged to "attempt to pay full invoices rather than partial payments on an invoice." A copy of the 1/25/01 letter is attached as Exhibit D.

**ANSWER:** MBI admits that on or about January 25, 2001, MBI sent a letter to RNA, which is attached to the Complaint and speaks for itself.

13. After RNA rejected MBI's January 25, 2001 offer during a personal meeting on or about February 1, 2001, MBI reformulated its proposal on February 12, 2001, suggesting new pricing for the specified products and vowing to increase volume with RNA as its financial condition improves. A copy of the 2/12/01 letter is attached as Exhibit E.

**ANSWER:** MBI admits that on or about February 12, 2001, MBI sent a letter to RNA, which is attached to the Complaint and speaks for itself.

14. On February 27, 2001, RNA forwarded to MBI a proposed Memorandum of Agreement as a rider to the parties' original Agreement which, among other things, accepted certain of MBI's pricings for products while offering both lower and higher prices for certain other products. A copy of the 2/27/01 rider is attached as Exhibit F. MBI never signed the proposed rider, and neither party accepted the rider to the Agreement.

**ANSWER:** MBI admits that on or about February 27, 2001, RNA sent a "Memorandum of Agreement" to MBI, which is attached to the Complaint and speaks for itself.

15. By letter dated March 26, 2001, MBI repudiated its contract with RNA and purported to terminate the parties' business relationship, but pledged to "maintain a payment schedule to clear up old debt at the rate of $150,000 per year." A copy of the 3/26/01 letter is attached as Exhibit G. MBI failed to give 90 days notice of termination as required by ¶ 7 of the Agreement. MBI's debt to RNA was never "cleared up".

**ANSWER:** MBI admits that on or about March 26, 2001, MBI sent a letter to RNA, which is attached to the Complaint and speaks for itself. MBI denies that it "repudiated" the Agreement, further stating that Paragraph 7 of the Agreement does not provide for "90 days notice of termination". MBI further states that MBI had terminated the Agreement in accordance with the provisions of paragraph 7.

16. MBI breached the terms of the Agreement, including, but not limited to, in the following material respects:

a) failing to meet the payment terms as set forth in ¶ 2:
b) failing to place orders for products in the quantities specified in ¶ 4;
c) failing to provide RNA with monthly filling forecasts detailing contract filling needs for a rolling four-month period as set forth in ¶ 3;
d) failing to provide RNA with monthly firm purchase orders detailing the required production for the following month as set forth in ¶ 4;
e) failing to have suitable packaging components delivered to RNA 15 days prior to production as set forth in ¶4; and
f) purporting to terminate its contract with RNA on or about March 26, 2001 without providing the advance notice required under ¶ 7 or ¶ 8, or the indemnification for specially purchased chemicals required under ¶¶3 and 8 thereof.

**ANSWER:** MBI denies it breached the terms of the Agreement further stating that MBI terminated the Agreement in accordance with the express provisions of paragraph 7 of the Agreement.

17. MBI is in violation of the terms of the Agreement, including its payment obligations despite demand made by RNA, the 90-day written notice of termination provision, and the terms of its own fourth quarter of 2000 payment schedule (Exhibit E). Moreover, MBI has failed to meet its monthly purchasing requirements.

**ANSWER:** MBI denies that it violated the terms of the Agreement.

18. RNA has complied with all material obligations required on its part under the terms of the Agreement.

**ANSWER:** Denied.

19. As a proximate result of MBI's breaches, including by failing to satisfy its outstanding balance, RNA incurred contract damages that, as of April 2001, totaled $270,880.92, and the cost of additional equipment and warehouse space secured for the MBI production in anticipation of fulfilling the Agreement, plus the cost of the unused, specially blended chemicals specifically purchased for MBI production, in a total amount that exceeds $100,000.00.

**ANSWER:** Denied.

WHEREFORE, plaintiff RNA Corporation prays that this Court enter judgment in its favor against the defendant Minnetonka Brands, Inc., in an amount to be determined by the trier of fact but in no event less than $370,880.92, plus prejudgment interest pursuant to 815 ILCS 205/2, and costs of suit.

## Count II – UCC § 2-709

20. RNA realleges and incorporates the allegations contained in paragraphs 1-18 of Count I as paragraph 20 of this Count II, as though fully set forth herein.

21. At all times pertinent, there was in force and effect a statute known as section 2-709 of the Illinois Uniform Commercial Code, 810 ILCS 5/2-709, which provides that a seller may recover, together with its incidental damages, the price of goods accepted by the buyer who refuses to pay for such goods as they become due.

**ANSWER:** Admit

22. As a proximate result of MBI's refusal to pay for goods from RNA as they became due, RNA incurred damages that, as of April 2001, totaled $270,880.92, and incidental damages including the cost of the additional equipment and warehouse space secured for the MBI production in anticipation of fulfilling the Agreement, and the cost of the unused, specially blended chemicals specifically purchased for MBI production, in the total amount that exceeds $100,000.00.

**ANSWER:** Deny

WHEREFORE plaintiff RNA Corporation prays that this Court enter judgment in its favor and against defendant Minnetonka Brands, Inc., in the amount to be determined by the trier of fact but in no event less than $370,880.92 pursuant to 810 ILCS 5/2-709, plus prejudgment interest and costs of suit.

## Count III – UCC § 2-708

23. RNA alleges and incorporates the allegations contained in paragraphs 1-18 of Count I as paragraph 23 of this Count III, as though fully set forth herein.

24. At all times pertinent, there was in force and effect a statute known as section 2-708 of the Illinois Uniform Commercial Code, 810 ILCS 5/2-708, which allows for the recovery of lost profits and incidental damages from a buyer who repudiates the contract.

**ANSWER:** Admit

25. As a proximate result of MBI's repudiation of the Agreement, RNA has lost the profits it reasonable expected to make from full performance of the Agreement by MBI, in an amount to be determined by the trier of fact, and in reliance upon which RNA incurred significant expenses, including for the equipment, chemicals and warehouse space it invested in to meet the production and shipping requirements of MBI.

**ANSWER:** Deny

WHEREFORE, plaintiff RNA Corporation prays that this Court enter judgment in its favor and against the defendant Minnetonka Brands, Inc. in an amount to be determined by the trier of fact to reasonably compensate it for the profits lost as a consequence of MBI's repudiation of the Agreement pursuant to 810 ILCS 5/2-708(2), plus its incidental damages, prejudgment interest and costs of suit.

### Count IV – Account Stated

26. RNA alleges and incorporates the allegations contained in paragraphs 1-19 of Count I as paragraph 26 of this Count III, as though fully set forth herein.

27. RNA regularly sent to MBI statements of its account with RNA. MBI consistently retained these statements of account dating to 1999 without interposing any objections to their accuracy or validity. In fact, MBI acquiesced in the accuracy and validity of such statements by (among other things) making partial payments.

**ANSWER:** Denied

28. An account was stated between the parties.

**ANSWER:** Denied

WHEREFORE, plaintiff RNA Corporation prays that this Court enter judgment in its favor and against defendant Minnetonka Brands, INC. in an amount to be determined by the trier of fact but in no event less that $370,880.92, plus prejudgment interest pursuant to 815 ILCS 205/2, and costs of suit.

### Count V – Promissory Estoppel (pled in the Alternative)

29. Pleading in the alternative, RNA realleges and incorporates the allegations contained in paragraphs 1-6 and 15-17 of Count I as paragraph 29 of this Count V, as though fully set forth herein.

30. Prior to investing in the equipment necessary to meet the projected production demands of MBI, RNA fully related to MBI its intentions to make major purchase of equipment and to secure warehouse space to be in a position to meet MBI's projected production volumes. As an enticement to make such purchase, MBI promised to enter into and honor a minimum three-year purchase agreement with RNA, and to order a minimum of 600,000 units of various personal care products on a monthly basis.

**ANSWER:** MBI admits that the Agreement called for sales volumes of 600,000 units per month but also provided that "unit commitment by MBI is subject to customer demand. MBI denies the reaming allegations of paragraph 30.

10

31. In reliance on MBI's unambiguous promises, RNA purchased the necessary production equipment, secured the warehouse space, and incurred additional expenses to be able to furnish MBI with its projected monthly quantities of products for a minimum of three years. RNA has no reasonable alternative use to make of such equipment and has been damaged in the amount of these expenditures as a proximate result of its reliance on MBI's unambiguous promises.

**ANSWER:** Denied

WHEREFORE, plaintiff RNA Corporation prays that this Court enter judgment in its favor and against defendant Minnetonka Brands, Inc. in an amount to be determined by the trier of fact to reasonable compensate it for the production equipment, warehouse space, and additional expenses that it incurred, plus costs of suit.

**FIRST AFFIRMATIVE DEFENSE: TERMINATION**

**1. Paragraph 7 of the Agreement provides:**

If one party fails to meet an obligation of this Agreement, the other party will give notice in writing, via U.S. certified mail, Return Receipt Requested, detailing the failure and the negative impact of that action....Upon receipt of notice, the failing party will have 30 days to cure or remedy the problem. *If the problem is not corrected within 30 days from notice, this Agreement may be terminated.* (Emphasis supplied)

2. Paragraph 7 gives either party the right to terminate if one party notifies the other party in writing of an alleged failure to meet an obligation pursuant to the Agreement. **Paragraph 7 does not require that the termination be in writing.**

3     The termination provisions, involving termination for cause, in paragraph 7, are distinct from those in paragraph 8, which provide that either party may terminate the contract, "Absent any breach of the Agreement" by providing written Notice of termination 90 days prior to the termination.

4     On or about January 19, 2001, RNA sent MBI a Notice to Cure in accordance with paragraph 7 of the Agreement (Complaint, Exhibit C). In the weeks following the Notice to Cure, there were discussion between MBI and RNA concerning RNA's objections stated in its Notice to Cure as well as MBI's complaints concerning RNA's material breach of the Agreement.

5     On or around February 19, 2001, MBI terminated the Agreement with RNA, via telephone conversation in response to the Notice to Cure.

6     On or about February 27, 2001, in response to the oral termination of the Agreement, RNA sent to MBI a Memorandum of Agreement (Complaint, Exhibit F). The Memorandum of Agreement was prepared in response to MBI's oral termination of the Agreement and attempted to reinstate the Agreement. MBI never signed the Memorandum of Agreement.

7     On March 26, 2001, MBI sent to RNA a letter ("March 26, 2001 letter") which stated: "...it is in the best interests of both our companies to terminate our business relationship at this time." (Complaint, exhibit G)

8     MBI terminated the Agreement orally on or about February 19, 2001, and gave written notice, not required by paragraph 7 of the Agreement, on March 26, 2001.

9     RNA had no contractual relationship with MBI after February 19, 2001 and cannot seek damages from this Court for that period.

**SECOND AFFIRMATIVE DEFENSE: MODIFICATION**

1-9     MBI reallages paragraphs 1-9 of its First Affirmative Defense.

10     In or about June, 1999, three months after the execution of the Agreement, MBI contacted RNA and complained about the poor quality, failure to

package properly, poor delivery performance, noncompetitive pricing, and missing inventory.

11  The economy had declined between March, 1999 and June, 1999, making the sales targets stated in the Agreement unrealistic and difficult to achieve.

12  In or about June, 1999, RNA and MBI had discussions concerning RNA's deficiencies and agreed to modify the Agreement to reduce the monthly sales amounts. The agreed Modification was supported by good and valuable consideration, including MBI's payment for goods shipped and promise to do business with RNA in the future.

13  MBI fully complied with the Agreement as modified, in accordance with the provisions of 810 ILCS 5/2-208.

## THIRD AFFIRMATIVE DEFENSE: SETOFF (IN THE ALTERNATIVE)

1-13  MBI reallages paragraphs 1-13 of its Second Affirmative Defense.

14  At all relevant times herein, RNA was under a duty to mitigate any damages it claimed for alleged breach of the Agreement.

15  At the time this action was filed, there was $64,000 worth of MBI inventory located at RNA's place of business.

16  MBI offered to pay MBI $64,000 in exchange for the release of MBI inventory held by RNA. During the time the inventory was held by RNA, some of the product was discontinued and of no value to MBI.

17  MBI also offered to purchase from RNA RNA's chemical inventory to resell to other manufacturers. RNA refused this offer.

18  Equipment allegedly purchased by RNA for MBI product is universal and could be used to produce a wide variety of market products.

19  RNA refused to use said equipment for other product runs for other customers.

20  RNA failed to mitigate its damages.

## FOURTH AFFIRMATIVE DEFENSE: REVOCATION OF ACCEPTANCE

1-20    MBI reallages paragraphs 1-20 of its Third Affirmative Defense.

21      Throughout the course of the shipments at issue in this lawsuit, RNA shipped defective product, failed to package product in accordance with the express instructions of MBI, and shipped product late. (A memo from MBI to RNA dated August 22, 2000 is attached hereto as Exhibit A).

22      MBI revoked its acceptance of shipments of non-conforming goods in accordance with 810 ILCS 5/2-608.

## FIFTH AFFIRMATIVE DEFENSE: UCC 2-703

1-22    MBI realleges paragraphs 1-22 of its Fourth Affirmative Defense

23      At all relevant times herein, the parties were bound by UCC 2-703 (810 ILCS 5/2-703).

24      UCC 2-703 provides for Seller's remedies in the event the buyer wrongfully rejects goods or revokes its acceptance, or fails to make a payment due to Seller.

25      RNA wrongfully refused to comply with the express terms of UCC 2-703, pursuing instead an action for price under UCC 2-709.

## COUNTERCLAIM

MBI complains against RNA as follows:

1.  At all relevant times herein, RNA failed to adhere to the express terms of Agreement by:
    a.  Failing to deliver product in a timely fashion;
    b.  Short-shipping goods ordered by MBI;
    c.  Failure to track inventory;
    d.  Shipping defective or nonconforming goods;

    e.      Improperly packaging the goods;

    f.      Failing to give MBI production schedules.

2. MBI was damaged by RNA's conduct in the following amounts:

    a.      $40,441.35: Labor cost for rework and relabling of footers, tottle bottles and toppers;

    b.      $13,995: Kmart chargebacks;

    c.      $8,583.17 Kmart Expedited freight fees;

    d.      $40,000 Missing Inventory;

    e.      $156,532.18 Lost Sales;

    f.      $300,000-$450,000 Missed sales, backorders;

    g.      In excess of $300,000 for loss of Walmart account and poor customer service caused by RNA's breach. (Exhibit B attached hereto)

3. RNA was given repeated notices of RNA's breaches and provided with an opportunity to cure said defects (Exhibit A attached hereto)

4. MBI is entitled to consequential and incidental damages in accordance with UCC 2-711-UCC 2-714.

WHEREFORE, MBI prays that the Court enter judgment in its favor against RNA in an amount in excess of $900,000.

                                                               Minnetonka, Inc.

                                By:    Thomas Flannigan

Thomas Flannigan
Three First National Plaza
70 West Madison Street, Suite 5330
Chicago, IL 60602
(312) 236 9335

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that the Defendant's Answer, Affirmative Defenses and Counterclaim was served on the Plaintiff, RNA Corporation, by depositing copies of the pleadings in an envelope in the U.S. Mail depository located at 70 W. Madison St., Chicago, IL, before 5:00 p.m. on December 21, 2001, with proper postage prepaid.

                                                                    Thomas Flannigan



# MINNETONKA BRANDS, INC.

| | | | |
|---|---|---|---|
| **To:** | Bob Brown / Mohamed | **From:** | CAROL FLEMING |
| **Fax:** | 708-597-8151 | **Date:** | August 22, 2000 |
| **Company:** | RNA | **Pages:** | 1 |

**Urgent** x **For Review** ☐ **Please Comment** x **Please Reply** ☐ **Please Recycle**

---

Bob / Mohamed,

    This has been a very frustrating day! I had NO indication that you would not be running tottles for MBI *again* today. The batch for the Tweety Footers (Blue) was to be mixed last Friday and Saturday to fill Monday. Monday nothing! Monday I was told they batched. I sent the "Pucks" for the Footers by air yesterday to arrive today. Today I talked to Marsha. They were not running the tottles because they were waiting for the pucks. I asked that they just fill and not label so we could get some Footers on a truck. No, they were waiting for the pucks. This afternoon I talked to Debbie, because I was unable to reach Marsha, to see how much they were able to produce. Nothing, the Footers aren't even SCHEDULED until Thursday!! Why can't someone tell me what is going on???

    We needed the new 11oz round Whistle toppers to ship to our customers on Friday the 25th. This had been relayed on in different ways. An update of when the whistles would be arriving from China (please have the batch in the schedule), a spreadsheet of the open purchase orders and notes attached to each line stating their status, a fax on 8/16 again spelling it out in detail. NOW I FIND OUT THE 11 oz IS RUN ON THE SAME LINE AS THE TOTTLES AND WILL NOT RUN UNTIL AFTER THE TOTTLES!! This will not make our 8/25 ship from Minnesota to our customers!

    I also need you to keep running the green 16 oz BB. This is a HOT item also. Will we ever get caught up?

    I am very worried now about the Character bottles that we must ship out to a customer by the end of September. If we miss this order we will be sitting with all these old components with no orders. I need to know if the chemicals have been ordered, and if the lines have been scheduled. How long will it take to run all of them and when do you have to begin in order to make the deadline? I also need to know if you are willing to ship direct from RNA.

    I know MBI is not your only (or even BEST) customer, but I have given you fair warning of these deadlines. I expect to know at all times what items are scheduled and when I can expect them. Then we have the chance to each voice our concerns. If you aren't going to run for us for whatever reason, I need to know this. We are constantly calling our customers and brokers giving them new dates to expect the products and then have to call them back again. This will happen only so many times and then they will quit ordering. I need someone I can rely on.

    Please give me as soon as you return so we can work a schedule out.      Carol Fleming

**7865 COMMERCE WAY • EDEN PRAIRIE, MN 55344 • 952-949-____ • 952-949-6417 FAX**
**• EMAIL cfleming@byminnetonka.com**



# INTEROFFICE MEMORANDUM

**TO:** R. WILLIAMS   T. KRAUS
**FROM:** S. STOREBO
**SUBJECT:** RNA COST
**DATE:** 01/04/01

---

THE FOLLOWING COSTS ARE ATTRIBUTABAL TO RNA:

LABOR COST FOR REWORK/LABELING OF FOOTERS, TOTTLE BOTTLES AND TOPPERS   **$40,441.35**

KMART CHARGEBACKS **$13,995**

KMART EXPEDITE FREIGHT FEES **$8,583.17**

INVENTORY DISCREPANCY; I.E. MISSING COMP INVENTORY **$30,000**

LOST SALES; I.E. NON REOCURRING ORDERS **$156,532.18**

MISSED SALES/BACKORDERS **$300,000 - $450,000**

COST OF POOR CUSTOMER SERVICE - LOST THE WALMART ACCOUNT; I.E. AND POOR "PR" — CAN'T PUT A PRICE ON THIS!!!!!!!!



EXHIBIT "G"